## CONTINUATION OF AN APPLICATION

I, Robert Henley, being first duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

This continuation is in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for information located on a broken cellular telephone recovered in a vehicle occupied by two acknowledged drug couriers. The cellular phone is in the possession of the Battle Creek Police Department and is further described as: **a broken Tracfone Wireless cellular phone, IMEI- 01511400, Alcatel Model Number- A405DL.**

Affiant is an officer with the Battle Creek Police Department, assigned to the highway and hotel drug interdiction/ fusion center. Affiant has been employed as a Police Officer for over 7 years. Affiant is a Homeland security Task Force Officer for the last 2 years. Affiant has been involved in over 200 investigations involving narcotics violations. Affiant has attended multiple instructional training seminars involving the investigation of illegal sales of controlled substances

There is probable cause to believe that ANDREW BRAVO is involved in a drug-trafficking organization ("DTO") that distributes cocaine and methamphetamine and proceeds from such distribution. Based on that probable cause, this Court has authorized GPS tracking of three vehicles used by ANDREW BRAVO. That GPS tracking was augmented by physical surveillance by law enforcement officers.

## PROBABLE CAUSE

1.      On 3-1-2019, Homeland Security Investigations (HSI) Task Force Officers (TFO) with the Battle Creek Police Department (BCPD) along with Officers BCPD and Emmett Police Department (EPD) conducted physical Surveillance on Andrew BRAVO.

2. During the surveillance operation, Andrew BRAVO was observed carrying a blue bag as he exited his residence at 64 W. Kingman, Avenue in Battle Creek, Michigan.

3. During the surveillance, Officers also observed BRAVO get into a Honda Accord bearing Michigan license plate DXT 0553 and drove to the Lakeview Square mall parking lot located in Battle Creek, Michigan. Prior to leaving in the Honda Accord from 64 W Kingman Ave, BRAVO was also observed by officers driving his 2015 Cadillac Escalade bearing Michigan plate DYL 9151.

4. BRAVO was surveilled by officers driving the Honda Accord entering the mall parking lot where he circled the lot and ultimately parked beside a White Jeep Grand Cherokee bearing Indiana license plate AQL713.

5. HSI TFO Rob Henley watched a Hispanic male, later identified as Ricardo MERCADO, get out of the passenger seat of the White Jeep and get into the passenger seat of ANDREW BRAVO's vehicle. The male had nothing in his hands at that time. BRAVO then drove around the mall parking lot with the unknown Hispanic male for about 10 minutes then BRAVO dropped the male back off to the white Jeep. When MERCADO got out of the passenger side of ANDREW BRAVO's vehicle, MERCADO was observed by officers now carrying a blue bag in his hand. MERCADO then got back in the white Jeep, and officers observed MERCADO place the bag in the back seat.

6. Michigan State Police (MSP) troopers later conducted a traffic stop on the white Jeep along the I-69. A consent search was done on the jeep, and during the consent search the MSP trooper identified a blue bag in the back seat of the car, which was believed to be the same bag that the passenger got out of ANDREW BRAVO's vehicle with. That bag had a large sum of money inside. The money was rubber banded together in a blue plastic "LIDS" retail shopping

bag. There was also a receipt inside the bag with ANDREW BRAVO's name on it. The receipt was dated for 3/1/2019 at 12:26 hours.

7. A total count of the money was completed and came out to be $31,978 in U.S. currency that was located in the blue LIDS bag.

8. Officer Day was waiting with FRANSISCO. FRANSISCO told officer Day that DIAZ had another cell phone other than the I-phone that police already had. HSI TFO Burgess went back to the vehicle and located a flip phone between the center counsel and the passenger seat. DIAZ was sitting in the passenger seat when the vehicle was stopped. The flip phone was broke in half as if someone was trying to destroy the content that was on the phone because it would aid police in this investigation. The flip phone was a Tracfone Wireless model number A405DL.

9. Non-custodial interviews pertaining to the ownership of the money were conducted by HSI Special Agent Jeff Williams. The two males were identified as Francisco HERNANDEZ-DURAN and Ricardo MERCADO (AKA: Heriberto DIAZ LOZANO). Both claimed no ownership to the money and signed DHS abandonment forms for the $31,978. Both individuals also signed DHS consent to search forms for their I-Phones.

10. MERCADO also initially stated that he was a DEA informant and provided a phone contact for a DEA agent in Kentucky. Deconfliction was conducted and verification that MERCADO was not a DEA informant, however, DEA Kentucky TFO Daniel Evans provided information that they had previously encountered MERCADO departing a suspected drug house which resulted the seizure of a large sum of money and several kilos of crystal methamphetamine.

11. MERCADO added that he had been working for the Sinaloa Cartel, and had been forced by threat to work for the Cartel.

12. MERCADO and HERNANDEZ DURAN were identified as being Mexican Nationals illegally present in the United States and were transported to the Calhoun County Jail and placed on an immigration detainer pending removal proceedings.

13. The observations of MERCADO, HERNANDEZ DURAN and ANDREW BRAVO were consistent with BRAVO having made payment for drugs; MERCADO's statement that he had been working with the Sinaloa Cartel add support to these observations. The attempted destruction of the cell phone is consistent with an attempted spoliation of evidence to prevent law enforcement from gathering it.

ADDITIONAL INFORMATION SUPPORTING A CONCLUSION THAT ANDREW BRAVO IS INVOLVED IN DRUG TRAFFICKING:

14. Affiant has been aware of a subject by the name of ANDREW BRAVO for the last 2 years. Affiant has had several pieces of information that ANDREW BRAVO has been involved in the sale of narcotics, specifically, cocaine.

15. Subjects "W", "X", and "Y" are all confidential informants. "W", "X", "Y" have all provided information to affiant at different periods in time, over the last 18 months, in regards to criminal drug activity. All have direct experience with heroin, cocaine, and/or methamphetamine, and how it is packaged for sale. This information provided to affiant from subjects "W", "X", and "Y" then led Affiant to seizures of illegal drugs. The evidence located from these criminal investigations were all consistent with the information subjects "W", "X", and "Y" had provided, thus their information was reliable.

16. "W" has purchased narcotics under the direction of the Battle Creek Police department. "W" has a criminal history involving drugs, bribery, fraud, and traffic offenses. "W" was apprehended by affiant with over 100 grams of crack cocaine.

17. "X" has purchased narcotics under the direction of the Battle Creek Police Department. "X" was arrested after signing a confidentiality form for the Battle Creek Police department. Part of that confidentiality form states while working with the Battle Creek Police department the CI shall not do anything illegal or get arrested. After several purchases, the informant was placed on probation and the Battle Creek Police department did not work with the "X" after that point.

18. "Y" has provided affiant with information that affiant has been able to independently verify to be true. "Y" has a history of bank fraud and has an open case with the Battle Creek police department and the federal government.

19. On 5-19-2017, Homeland Security Task Force Officer James Mackey contacted affiant. HSI TFO Mackey received a call from "W" indicating he/she knew a subject named JOHN MOORE. MOORE told "W" that ANDREW BRAVO would be meeting with a supplier of narcotics and a semi-truck transporting the narcotics sometime over the weekend of 5-19-2017. This semi-truck was to be coming from the state of Washington. The shipment of narcotics was believed to be several kilos of heroin and several kilos of methamphetamine. "W" provided TFO Mackey with BRAVO's cell phone number of 317-384-4375 that BRAVO used to communicate with others to conduct illegal drug sales.

20. JOHN MOORE told "W" that the shipment of narcotics would be a "sample." MOORE told "W" that he gets his drugs to sell from BRAVO. MOORE told "W" that BRAVO wanted to get larger shipments of narcotics and that his source was going to be from the state of Washington. Affiant was relayed all of this information from TFO Mackey.

21. On 5-19-2017, affiant executed a search warrant on the phone number of 317-384- 4375. The search warrant included future geo location of the phone and historical phone

records. Through an analysis of the phone records, TFO Mackey informed affiant that phone number 317- 384-4375 called a Washington state phone number of 509-792-4712.

22.     That same day, affiant completed a search warrant for phone records and geo location on phone number of 509-792-4712. This phone had been powered off, but the last geo location for this phone number within the previous two hours was at the Denver, Colorado airport.

23.     Later on in the day on 5-19-2017, the geo locations of both BRAVO's phone and the 509-792-4712 phone were at the Detroit airport at the same time. With bot phone geo locations located in the same spot, the Detroit Airport, it was believed they were traveling together back to Battle Creek.

24.     The information that CI "W" had relayed to TFO Mackey led affiant to suspect that BRAVO had just picked up someone from the Detroit airport related to the drug supplier shipment coming in from the state of Washington. The 509-792-4712 phone number was suspected to belong to the drug supplier. It was suspected that BRAVO and the drug supplier were traveling back to Battle Creek from the airport, in BRAVO's black 2011 Chrysler 200, IN registration "170LTO." Affiant had seen BRAVO driving that vehicle in the past, as supported by information CI "W" had also provided.

25.     Later on 5-19-2017, TFO Mackey advised affiant that he observed BRAVO's vehicle exit I-94 onto Capital Ave, in the city of Battle Creek. TFO Mackey further advised that he followed the vehicle, and it turned into the Quality Inn at 2590 Capital Ave. This is a hotel in the Battle Creek area. TFO Mackey saw BRAVO get out of the driver's side of the vehicle, and another male got out of the passenger seat at the same time. Affiant suspected the second male was the drug supplier from Washington.

26.     Over the next 48 hours, affiant and other officers conducted physical surveillance on BRAVO and the unknown male, in the event they had contact with someone in a semi-truck registered to the state of Washington. During this surveillance, affiant was advised that BRAVO and the unknown male went to various locations in the Battle Creek and Kalamazoo area, including strip clubs and Firekeepers Casino. Officers were unable to identify the person with BRAVO. However, information from the geo locations of both the 509-792-4712 phone and BRAVO's phone continued to show them in same exact location as BRAVO was physically seen throughout this period of surveillance.  Affiant believed the unknown male with BRAVO was in possession of the 509-792-4712 phone.

27.     On 5-21-2017, officers initiated a traffic stop on the Chrysler 200 belonging to BRAVO. Affiant was advised the unknown male in the vehicle with BRAVO was ROSALIO SANCHEZ from Pasco, WA. SANCHEZ told officers that he had been incarcerated in federal prison with BRAVO in the past and was here visiting him.

28.     Affiant was advised there was also a third person in the vehicle who was identified as CARLOS SENDA. SENDA said that he had drove a semi-truck to Battle Creek, from Pasco, WA. SENDA stated the semi-truck was currently parked at the Quality Inn Hotel on Capital Ave. SENDA said he drove the semi-truck to Battle Creek to meet SANCHEZ and that SANCHEZ was going to be riding back with him to Washington.

29.      Affiant knew this to be the same Quality Inn that BRAVO and SANCHEZ were seen going into after arriving from the airport.  SANCHEZ and BRAVO told officers that they currently had rooms at the Quality Inn where the semi-truck was parked. Both individuals then gave consent for officers to search their hotel rooms. SENDA also gave consent to search the semi- truck. After driving at the Quality Inn, officer searched the hotel rooms and the truck.

Affiant was advised that no evidence of contraband was located inside the semi-truck or the hotel rooms. All subjects were ultimately released.

30. Later that day, CI "W" advised TFO Mackey the semi-truck load of narcotics had made it through before the officers had searched it.

31. Special agent Jeff Williams with the HSI advised affiant that SANCHEZ was currently (i.e. at that time) involved in a federal drug investigation in Pasco, WA.

32. CI "X" contacted affiant on 1-20-2018 and 1-22-2018. "X" stated he/she had been involved with BRAVO and his narcotics distribution for a long time, specifically with cocaine. "X" stated BRAVO was "cartel" affiliated, but he/she did not know which cartel. "X" advised affiant that Migul Bravo is a cousin to ANDREW BRAVO and distributes narcotics in the surrounding Battle Creek area. "X" said that he/she personally witnessed Migul Bravo sell ecstasy to patrons at a Vegas strip club within the last six months.

33. "X" also advised affiant that he/she saw ANDREW BRAVO and his brother Anthony Bravo driving several different BMW's and Mercedes in the last year. "X" said that ANDREW BRAVO is married to a female named Sara McCeiver.

34. From my investigation, it does not appear that ANDREW BRAVO has any legitimate employment or source of identifiable income and that his purchase of homes, renting of hotel rooms and driving of luxury cars is far above the lifestyle one might expect from an unemployed person.

35. On 2-2-2018, "X" did a controlled buy with affiant and other members of the Battle Creek Police Department. "X" went to DANNY CRAIG's residence at 481 E Emmett St., and then CRAIG called ANDREW BRAVO. After the call, ANDREW BRAVO's Chrysler 200

with IN registration 170LTO arrived w with an unknown subject matching ANDREW BRAVO's description in the driver seat.

36.     The police surveillance team advised affiant that they watched DANNY CRAIG come outside and get into the passenger seat of the Black Chrysler 200. CRAIG stayed in the vehicle for about 1 to 2 minutes, got out of the car and went back inside where "X" was waiting. "X" advised affiant that once CRAIG came back inside the house, he/she then purchased a quarter ounce of cocaine for $350 from CRAIG. CRAIG told "X" that he was going to plug "X" straight into ANDREW BRAVO because CRAIG did not want "X" to come to his house because he did not want it heated up. "X" met Detective Huggett back at a predetermined location and turned over the quarter ounce of cocaine he/she had just purchased from CRAIG. Detective Huggett gave affiant the narcotics. Affiant placed the cocaine into BCPD evidence.

37.     After CRAIG exited the Chrysler 200 in the driveway of 481 E Emmett St., the vehicle left and was followed by officers to 165 N 16th St. in Springfield.

38.     On 2-7-2018, CI "X" contacted affiant and stated that CRAIG told him/her that KYLE KEELER gets his drugs from ANDREW BRAVO.

39.     On 2-14-2018, affiant made contact with the General Manager (GM) of the Quality Inn hotel on Capital Ave. The GM advised me that ANDREW BRAVO had reserved a room the week prior, paid cash, and left. The GM had not seen him again since that time. At approximately 16:51 that same day, the GM contacted affiant and advised that ANDREW BRAVO had just returned and rented room 133, but then subsequently changed to room 311.

40.     On 2-15-2018, affiant had CI "X" do a second controlled buy with DANNY CRAIG. "X" went to 481 E Emmet St., met CRAIG and purchased a half ounce of cocaine for $700. CRAIG reassured "X" that he was going to introduce "X" to ANDREW BRAVO and again said that ANDREW BRAVO is the "plug." "X" returned to the predetermined location and turned over the quarter

ounce of cocaine to detective Huggett. Detective Huggett gave affiant those narcotics, and I placed the cocaine into BCPD evidence.

41.     On 2-20-2018, the GM of the Quality Inn again contacted affiant. The GM advised that ANDREW BRAVO had rented a room the night before and had checked out today. The GM advised that the only thing left in BRAVO's room was a shipping box and a very large Ziploc bag.

42.     Affiant retrieved the shipping box and Ziploc bag found in BRAVO's hotel room and took it back to the Battle Creek Police Department to examine the shipper and receiver information on the shipping box. The return address information was: Giant Teddy Ray Korvay Inc., 1070 N Kraemer Pl, Anaheim, CA 92806. The box was shipped to: YAFINCEIO HARRIS, 612 Marketplace Blvd., Kalamazoo, MI. It is believed the Ziploc bag was from inside the shipping box and used to package the contents. These items were the only things left in room 311.

43.     Affiant had two separate canine (K9) units check the box and bag for the presence of narcotics. Both K9's alerted to the presence of narcotics on the box and Ziploc bag. Both K9 units and their handlers are trained and certified to detect narcotics, including cocaine.

44.     On 6-2-2018, the GM of Quality Inn contacted affiant and advised affiant that ANDREW BRAVO had rented room 306 for the night. On the same day, a Customs and Border Patrol (CBP) officer was renting a room a few doors down from the room ANDREW BRAVO rented. The CBP officer called 911 dispatch for the smell of marijuana coming from room 306. Affiant made contact with the CBP officer. He stated that he could smell a strong odor of marijuana coming from ANDREW BRAVO's room. He did not know ANDREW BRAVO but knew it was coming from room 306.

45.     Immediately after learning of the marijuana odor from ANDREW BRAVO's room, Detective Huggett requested and watched the surveillance video of the hotel to see if he

could find the exact time when BRAVO had arrived at the hotel. Detective Huggett advised affiant that BRAVO came to the hotel in his black Chrysler 200 and was the only person in the car. BRAVO brought in a large box through the rear hallway entrance of the hotel, which was believed to be taking it to his rented room. Detective Huggett told affiant that BRAVO looked like he was struggling while carrying the box inside, indicating it may have contained a heavy object.

46. ANDREW BRAVO did this same thing on 2-20-2018 when affiant located a large empty shipping box in his empty hotel room.

47. On 10-10-2018, CI "Y" informed police Corporal Gancer of the following information which was given to affiant: ANDREW BRAVO has been driving a black Dodge pick-up truck that is registered to TIRELL THOMAS who had recently been indicted by the federal government and was involved with narcotics trafficking. Affiant confirmed through the U.S. Attorney's Office that TIRELL THOMAS has a criminal history of bank fraud and drugs.

48. On 10-31-2018, Corporal Gancer advised affiant that he made contact with "Y." "Y" advised that on this date he/she had been in contact with ANDREW BRAVO on the Target Phones. For the last year, "Y" had been working for ANDREW BRAVO, picking up narcotics in Chicago and driving the narcotics back to BRAVO in Battle Creek. BRAVO would give "Y" large amounts of U.S. currency and "Y" would transport the U.S. currency back to Chicago for the payment of the narcotics.

49. "Y" further told Corporal Gancer that he/she lived in the Chicago area. ANDREW BRAVO would call "Y" and have "Y" go to a building in Chicago, IL, to pick up cocaine. "Y" would pick up 1-2 kilograms of cocaine per trip. "Y" would drive the narcotics to Battle Creek. Most of the time, "Y" would drive the narcotics to 73 Walters Ave, in Battle Creek, MI. Once, "Y" went to the address BRAVO gave him/her and BRAVO met "Y" there. "Y" gave

the narcotics to BRAVO, and BRAVO would give "Y" U.S. Currency. "Y" said the currency amount ranged from around $30,000 to $66,000 U.S. currency. After, "Y" would take the U.S. Currency back to Chicago where he/she initially picked up the narcotics and drop it off.

50. "Y" told Corporal Gancer that he/she began making these narcotics trips for ANDREW BRAVO in January of 2017. "Y" said that he/she would make up to 4 trips a week, sometimes two trips per day, picking up and dropping off drugs and U.S. currency for BRAVO. "Y" said that BRAVO would pay "Y" $1,000 per trip made for transporting the drugs and U.S. currency.

51. According to the Battle Creek Assessor files, in March of 2017 ANDREW BRAVO purchased 73 Walter Ave for $6,200. In November of 2017, ANDREW BRAVO deeded 73 Walters to AMANDA MILLER (registered co-owner of the Cadillac Escalade) for $2,000.

52. Through surveillance, affiant believes AMANDA MILLER and ANDREW BRAVO are in a relationship together and have been living at the same residence at 64 W Kingman Ave.

53. On 11-20-2018, "Y" told affiant he/she spoke with ANDREW BRAVO. On that date, BRAVO told "Y" that he wanted to set up a future meeting with to discuss transporting more drugs.

54. On 11-21-2018, affiant and other members of the Battle Creek Police Department conducted physical surveillance on ANDREW BRAVO. BRAVO was driving the black Dodge pick-up truck that has been listed in this affidavit.

55. On 12-4-2018, affiant and other members of the Battle Creek police department conducted physical surveillance of ANDREW BRAVO. During the surveillance affiant watched ANDREW BRAVO get into the Dodge Ram outside of 64 W Kingman Ave. ANDREW BRAVO

was the only occupant inside the vehicle. ANDREW BRAVO then drove to 32 Rockford, got out of the driver seat, and went inside 32 Rockford, using the back door of the residence. BRAVO was inside the residence and exited between 4 and 10 minutes later, when he got back in the Dodge Ram. BRAVO drove the Dodge Ram to 252 Willison and pulled into the driveway. Affiant observed a white male wearing a red hooded sweatshirt get in the passenger side of the vehicle. Affiant was able to see what looked like an exchange of something between BRAVO and the passenger that got in the vehicle. About 5 minutes later, the male in the red hooded sweatshirt got out of the vehicle and BRAVO left. BRAVO then drive back to 64 W Kingman Ave. where affiant watched BRAVO go back inside 64 W Kingman.

56. Affiant knows through training and experience that short durations of a meeting that occur inside a car like the one listed above are consistent with the way drugs are exchanged.

57. On 01-04-19, "Y" reported that he/she talked with ANDREW BRAVO and BRAVO told "Y" that he was going to Chicago "to meet with his people." "Y" stated this means that BRAVO was going to meet with his drug suppliers and begin to make more trips.

58. On 01-04-19, "Y" reported that he/she talked with ANDREW BRAVO and BRAVO told "Y" that he was going to Chicago "to meet with his people." "Y" stated this means that BRAVO was going to meet with his drug suppliers and begin to make more trips.

## CONCLUSION

I respectfully submit that there is probable cause to believe that ANDREW BRAVO, Francisco HERNANDEZ-DURAN and Ricardo MERCADO (AKA: Heriberto DIAZ LOZANO) have committed crimes in violation of 21 USC 846, 841(a)(1), and 841(b)(1)(B)(i), based upon

the facts contained in this affidavit. I further submit that evidence, fruits, and instrumentalities of those crimes, listed in Attachment B, are located on the Subject Device.

      Wherefore, by this continuation and application, I respectfully request that the Court issue a search warrant that would allow agents to search for and seize evidence on the Subject Device. The items and information sought to be seized are more specifically described in Attachment A.